**FILED**
U.S. District Court
District of Kansas

UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

SEP 16 2015

Clerk, U.S. District Court
By_____Deputy Clerk

IN THE MATTER OF THE
APPLICATION OF THE UNITED
STATES OF AMERICA FOR AN
ORDER AUTHORIZING THE
INSTALLATION AND USE OF A PEN
REGISTER AND TRAP AND TRACE
DEVICE

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 15-*CM-60087-EFM*

**FILED UNDER SEAL**

## APPLICATION

The United States of America, by its attorney, Matt Treaster, Assistant U.S. Attorney, pursuant to Title 18, United States Code, Section 3122, hereby applies to the Court for an Order pursuant to Title 18, United States Code, Section 3123 authorizing the installation and use of pen registers and trap and trace ("pen-trap") devices in order to capture dialing, routing, addressing and signaling information on communications[1] generated from or received by the following WhatsApp Inc. ("WhatsApp") account(s): 316-519-8218 (hereinafter, the aforementioned WhatsApp accounts will be collectively referred to as the "**Subject Account**")[2].

In support of this application, the applicant states as follows:

1.      I am an "attorney for the Government" as defined in Federal Rule of Criminal Procedure 1(b)(1)(B), and authorized to apply for the instant Order.

2.      The Drug Enforcement Administration (DEA)("investigating agency") is investigating **Felizardo URIAS-Avilez, Noe BELTRAN-Ramirez, Rosa ROBLES-Arambula, Hipolito MERAZ-Leyva, Roque MATA, and Luis Gerardo ARREDONDO-Duarte**, and others, in connection with possible violations

---

[1]      Throughout this Application, the use of "communications" refers to both electronic and wire communications.

[2]      Unless otherwise specified, the identity of the person to whom each WhatsApp account is leased to, or whose name is listed to the WhatsApp account, to which the pen register and trap and trace device is to be attached and/or applied to, is unknown.

of federal law, including Title 21, United States Code, Section 841(a)(1) – distribution of controlled substances; Section 846 – conspiracy or attempt to distribute controlled substances; Section 843(b) – use of communication facilities in drug trafficking; Section 952 – importation of controlled substances; Section 963 – attempt and conspiracy to import controlled substances; in the District of Kansas and elsewhere in the United States. I certify, as required by Title 18, United States Code, Section 3122(b)(2), that the information likely to be obtained from the pen-trap device is relevant to the ongoing criminal investigation being conducted by the investigating agency. As detailed in the accompanying Affidavit, sworn to and prepared by Special Agent Charles Armour, DEA, investigators believe that the WhatsApp account is being used on an ongoing basis to distribute controlled substances, the possession with the intent to distribute controlled substance, the use of the WhatsApp account to facilitate these crimes, and the conspiracy to commit these crimes, and that the information collected and analyzed pursuant to the requested order will assist in the identification of others who are involved in the drug distribution business.

3.     A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3).   A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4).   In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls.   Similar principles apply to communications utilized by WhatsApp as described below.

4.     WhatsApp provides internet based multimedia messaging services via software applications that function using cellular (e.g., Verizon, Sprint, AT&T) or wireless data connections (e.g., a Wi-Fi access point).  WhatsApp is an alternative to traditional cellular short message service (SMS) and multimedia service (MMS), and therefore avoids SMS and MMS charges cellular providers may charge for those services.  WhatsApp is available for smartphones utilizing the following operating systems: iOS, Android, Blackberry, Nokia S40, Symbian and Windows Phone. WhatsApp is also offering voice calling services starting with phones using the Android operating platform.  Similar to the messaging service, the WhatsApp calling feature uses the phone's data connection.   WhatsApp works across the above operating systems, allowing any WhatsApp user to communicate with another user, without restriction to the operating systems utilized by each user.

5.     A WhatsApp user account identifier, correlates to a cellular telephone number.  To obtain a WhatsApp account a user downloads the software application onto a smartphone and registers the account by entering the phone number.  During the registration/activation process, WhatsApp provides the user a verification code, commonly via an SMS text message or automated voice call.    It is possible to activate and use the WhatsApp application on one device using the telephone number of another device, so that the account ID does not necessarily correlate to the cellular telephone number of the smartphone a user uses WhatsApp on.   Nonetheless, a WhatsApp account can only be verified with one number on one device. Additionally, WhatsApp allows its users to transfer their accounts from one phone to another.

6.     WhatsApp allows its users to send text messages, to set up a group chat, and to share contacts, and multi-media files, such as, videos, photos and location coordinates with other WhatsApp users. WhatsApp also allows its users to send broadcast messages or "blasts," which are one-way messages sent to a group.  If a user replies to a broadcast message, it will appear as a normal message; the reply will

only be sent to the sender, and not be sent to other recipients in the Broadcast list. When using WhatsApp to communicate, the message is routed through the internet, using the device's Internet data plan or via Wi-Fi.

7.     In addition to smartphones, WhatsApp provides WhatsApp Web, which allows users to use the same WhatsApp account to send and receive messages from their computer, and those messages are fully synced between the phone and the computer so all messages can be seen on both devices.  For WhatsApp Web to function, the user's smartphone device and computer must be connected to the internet.[1]

## GOVERNMENT REQUESTS

8.     For the reasons stated above, the United States requests that the Court enter an Order authorizing the installation and use of pen-trap devices, without geographic limit,  to record, decode, and/or capture the dialing, routing, addressing, and signaling information for each communication to or from the **Subject Account**, including but not limited to the following:

(a)     Source and destination Account numbers or telephone numbers associated with the origination and termination of all wire and electronic communications to and from the **Subject Account**, including identifying all participants of multi-party communications (e.g., group chat, broadcast, etc.);

(b)     Date, duration, and timestamp for each communication and service event, to include specification of the time zone offset from Universal Coordinated Time (UTC);

(c)     The type of communication (e.g., text, image, video, location, audio, etc.);

(d)     IP Addresses associated with the originating and terminating customer devices used to send and receive communications (both IPv4 and IPv6);

---

[1] WhatsApp Web is not available for all operating systems or internet browsers.

(e)     Port Numbers (e.g. TCP/UDP Ports) associated with the originating and terminating customer devices used to send and receive communications (both IPv4 and IPv6);

(f)     Transport Protocol the originating and terminating customer devices used to send and receive communications (both IPv4 and IPv6);

(g)     Byte size information for each WhatsApp communication or other information from which the size of the communication and media transfers can be ascertained;

(h)     WhatsApp account numbers and any unique identifiers associated with each accounts/devices used to make and receive communications to and from the **Subject Account**, including identifying all participants of multi-party communications (e.g., group chat, broadcast, etc.), sent or received by the **Subject Account**, including the:

> WhatsApp Account Numbers
> Electronic Serial Number ("ESN"),
> Mobile Electronic Identity Number ("MEID"),
> Mobile Identification Number ("MIN"),
> Subscriber Identity Module ("SIM"),
> International Mobile Subscriber Identifier ("IMSI"),
> Mobile Station Identification Number ("MSID"),
> Mobile Service Node ("MSN"),

Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), or International Mobile Station Equipment Identity ("IMEI").

(i)     Addresses or other information that uniquely identify the **Subject Account** used to authenticate to WhatsApp or its network, including the Internet Protocol address and device identifiers of any smartphone or computer used to access the subject account; as well as the time, date and duration of such access.

9.    The United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).

10.    The United States further requests that the Court authorize the foregoing installation and use for a period of sixty days from the date of the Court's Order, pursuant to 18 U.S.C. § 3123(c)(1).

11.    The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order WhatsApp and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this Order to furnish, upon service of the Order, information, facilities, and technical assistance necessary to install the pen-trap devices, including installation and operation of the pen-trap devices unobtrusively and with minimum disruption of normal service; and in a manner accomplishes the interception of all of the dialing, routing, addressing, and signaling information associated with each communication to or from the Subject Account securely and reliably and in a format that allows the information delivered to the investigative agency to be understood by the applicant.  In particular, to facilitate this Court's Order, the United States requests that such assistance shall include the provision of (1) technical documentation and necessary assistance to enable the investigating agency to ascertain the meaning and significance of data in the delivery; to facilitate breaking down the information into distinct identifiable fields; and to address deficiencies and preferences with formats; and (2) a designated technical representative(s)/engineer(s) who will coordinate efforts with and have the authority to provide the investigating agency's technical staff the necessary information and technical assistance, including direct access to the network facilities used or controlled by or on behalf of WhatsApp, and any other person or entity providing wire or electronic communication service in the United States to the Subject Account, for purposes of testing, evaluation and provisioning of the technical means necessary to accomplish implementation of the authorized pen register and a trap and trace

device or process. Any entity providing such assistance shall be reasonably compensated by the investigating agency, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses directly incurred in providing facilities and assistance in furtherance of this Order.

12.     If WhatsApp or any other relevant provider of communication service to the public, cannot comply with this Court's Order to install the pen-trap devices, the United States requests authorization to install and use its own pen register and trap and trace devices on the data network of WhatsApp, or any other relevant provider of electronic communication service to the public, pursuant to 18 U.S.C. § 3123(a)(3)(A).

13.     The United States further requests that the Court order WhatsApp and any other person or entity whose assistance may facilitate execution of this Order to notify the applicant and the investigating agency of any changes relating to the **Subject Account**, and prior to terminating or changing service to the **Subject Account**, which might affect the implementation and utility of this Court's Order.

14.     The United States further requests that the Court order that the investigating agency and the applicant have access to the information collected by the pen-trap devices as soon as practicable, twenty-four hours per day, or at such other times as may be acceptable to them, for the duration of the Order.

15.     The United States further requests, pursuant to 18 U.S.C. § 3123(d)(2), that the Court order WhatsApp and any other person or entity whose assistance facilitates execution of this Order, and their agents and employees, not to disclose in any manner, directly or indirectly, by any action or inaction, the existence of this application and Order, the resulting pen-trap devices, or this investigation, unless and until authorized by this Court, except that WhatsApp may disclose this Order to an attorney for WhatsApp for the purpose of receiving legal advice.

16.    The United States further requests that this application and any resulting Order be sealed until otherwise ordered by the Court, pursuant to 18 U.S.C. § 3123(d)(1).

17.    The foregoing is based on information provided to me in my official capacity by agents of the investigating agency.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information and belief.

Dated this _16_ day of September, 2015.

Respectfully submitted,

MATT TREASTER
Assistant United States Attorney
301 N. Main, Suite 1200
Wichita, KS  67202
Tele:  316-269-6481
Fax:   316-269-6484
Matt.Treaster@usdoj.gov
Ks S.Ct.No. 17473

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| APPLICATION OF THE | ) | |
| UNITED STATES OF AMERICA | ) | |
| FOR AN ORDER AUTHORIZING | ) | **FILED UNDER SEAL** |
| THE INSTALLATION AND USE | ) | |
| OF A PEN REGISTER AND TRAP AND | ) | |
| TRACE DEVICE | ) | Case No. 15-*CM-60087-EFM* |
| | ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Charles Armour, being duly sworn, hereby declare as follows:

1.  I am a federal agent employed by the Drug Enforcement Administration (DEA) since May 4, 2014.  As such, I am empowered under Title 21, United States Code, Section 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants. I received initial training in narcotics trafficking investigations and related legal matters at the DEA Training Academy in Quantico, Virginia. Upon graduation from the DEA Academy, I was assigned to the Wichita Resident Office.

2.  Prior to my employment with the DEA, I had been employed as a federal agent with the United States Border Patrol in southern Arizona since September 11, 2006. As a Border Patrol Agent, I spent approximately three years working uniformed patrol. While in uniformed patrol, my duties included highway, wilderness, and stash house interdiction of bulk shipments of controlled substances.  As part of these interdictions, I have personally collected a substantial amount of evidence having to do with drug trafficking.

Page **1** of **13**

Examples of this evidence include drugs, drug paraphernalia, drug ledgers, smuggling route maps, phone contact lists, digital records on electronic devices, and records of communications with co-conspirators.

3. After working uniformed patrol for several years, I was assigned to an anti-smuggling investigations unit and was tasked with conducting stash house interdictions and investigations targeting criminal organizations involved in controlled substance smuggling, human smuggling, and violent crimes related to controlled substance smuggling. I was then assigned to an interagency Bureau of Alcohol, Tobacco, Firearms, and Explosives group investigating violent criminal street gangs and armed robberies related to narcotics trafficking. I then served as a Task Force Officer on a Federal Bureau of Investigation Southwest Border Violence Squad investigating the organized criminal enterprise activities of violent Mexican drug cartels.

4. The majority of the investigations I worked as a Border Patrol Agent involved criminal conspiracies to smuggle, transport, or otherwise traffic in controlled substances. As a part of these investigations I have personally collected or assisted in the collection of a substantial amount of evidence showing the existence of, or participation in, a criminal conspiracy to traffic or smuggle drugs. Examples of this evidence include drugs, drug paraphernalia, drug ledgers, digital records on electronic devices, records of communications with co-conspirators, documentary evidence, and suspect location data by covert tracker and cellular phone.

5. During my employment as a Law Enforcement Agent, I have been directly involved as the case agent in controlled substance trafficking investigations and other crimes related

to the trafficking and manufacture of controlled substances. I have interviewed numerous individuals, including victims, witnesses, informants, and violators. I have on numerous occasions investigated criminal law violations which have resulted in arrests, the recovery of evidence, and the seizure of property. Through the course of investigations I have been involved in, I have developed probable cause, requested, and executed various federal and state search warrants relating to drug trafficking violations and other criminal violations. I have documented my findings and presented them to federal and state prosecutors for review. I have also assisted other agents on numerous criminal investigations involving these offenses.

6. I have participated in investigations involving the interception of wire communications and electronic communications of digital display devices. I am familiar with the ways in which controlled substance traffickers and money launderers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of cellular telephones, digital display devices, computers and email, and their use of numerical codes and code words to conduct their transactions.

7. Over the course of my career as a Law Enforcement Agent, in addition to the standard training provided by the DEA and the Border Patrol, I have attended various additional training courses specifically on narcotics interdiction, advanced investigative techniques, and intelligence collection. These courses have been provided by various private, state/local, and federal entities.

8. I am an investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

9.    I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents of the DEA and other law enforcement officers; from my discussions with witnesses involved in the investigation; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Since this affidavit is being submitted for the limited purpose of securing an order authorizing the acquisition of the Requested Information, I have not included details of every aspect of the investigation. Facts not set forth herein, or in the attached exhibits, are not being relied on in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

10.    This affidavit is being submitted for the limited purpose of securing the installation and use of pen-trap devices, without geographic limit, to record, decode, and/or capture the dialing, routing, addressing, and signaling information for each communication to or from

the WhatsApp[1] account associated with the telephone number 316-509-8218 [**Subject Account**] including but not limited to the following:

(a) Source and destination Account numbers or telephone numbers associated with the origination and termination of all wire and electronic communications to and from the **Subject Account**, including identifying all participants of multi-party communications (e.g., group chat, broadcast, etc.);

(b) Date, duration, and timestamp for each communication and service event, to include specification of the time zone offset from Universal Coordinated Time (UTC);

(c) The type of communication (e.g., text, image, video, location, audio, etc.);

(d) IP Addresses associated with the originating and terminating customer devices used to send and receive communications (both IPv4 and IPv6);

(e) Port Numbers (e.g. TCP/UDP Ports) associated with the originating and terminating customer devices used to send and receive communications (both IPv4 and IPv6);

(f) Transport Protocol the originating and terminating customer devices used to send and receive communications (both IPv4 and IPv6);

(g) Byte size information for each WhatsApp communication or other information from which the size of the communication and media transfers can be ascertained;

(h) WhatsApp account numbers and any unique identifiers associated with each

---

1 WhatsApp is a messaging service that provides internet based multimedia messaging via software applications that function using cellular (e.g., Verizon, Sprint, AT&T) or wireless data connections (e.g., a Wi-Fi access point). WhatsApp is an alternative to traditional cellular short message service (SMS) and multimedia service (MMS), and therefore avoids SMS and MMS charges cellular providers may charge for those services. **Error! Main Document Only.**A WhatsApp user account identifier correlates to and is associated with a specific cellular telephone number.

accounts/devices used to make and receive communications to and from the **Subject Account**, including identifying all participants of multi-party communications (e.g., group chat, broadcast, etc.), sent or received by the **Subject Account**, including the:

- WhatsApp Account Numbers
- Electronic Serial Number ("ESN"),
- Mobile Electronic Identity Number ("MEID"),
- Mobile Identification Number ("MIN"),
- Subscriber Identity Module ("SIM"),
- International Mobile Subscriber Identifier ("IMSI"),
- Mobile Station Identification Number ("MSID"),
- Mobile Service Node ("MSN"),
- Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), or International Mobile Station Equipment Identity ("IMEI").

(i) Addresses or other information that uniquely identify the **Subject Account** used to authenticate to WhatsApp or its network, including the Internet Protocol address and device identifiers of any smartphone or computer used to access the subject account; as well as the time, date and duration of such access.

11.    The Drug Enforcement Administration (DEA) is conducting a criminal investigation of Felizardo URIAS-Avilez, Hipolito MERAZ-Leyva, Roque MATA, Gerardo REYES-Martinez, Darrin John MILLINGTON, and others known and unknown in connection with violations of the Controlled Substances Act, including Title 21, United States Code, sections 841 (Possession with Intent to Distribute, and Distribution of, Controlled Substances), 843 (Unlawful Use of a Communication Device in Connection with Drug Trafficking), and 846 (Conspiracy to Possess and to Distribute Controlled Substances)

## **BACKGROUND OF INVESTIGATION**

12. In 2015, investigators in Arizona began an investigation to identify suspects involved in a drug trafficking conspiracy to traffic quantities of narcotics and dangerous drugs in the Phoenix metropolitan area. Investigators began to determine who various members of the organization were, including sources of supply believed to be located in Mexico.

13. One target of the investigation was a person identified only as "KAINETE." KAINETE was identified as a source of supply and transporter who imported methamphetamine, cocaine, and heroin to co-conspirators in the United States, including inside Arizona. Investigators learned, through court ordered wire and electronic interceptions from the State of Arizona, that KAINETE was utilizing BlackBerry Messenger service[2] (BBM) 2AD34B89 to facilitate his illegal activity.

14. On June 23, 2015, the Thirty Third Amended Affidavit and Order for the interception of communications was signed by Maricopa County Superior Court Judge Pamela Gates. The court authorized the interception of BBM 2AD34B89 (Target Line #96), utilized by FNU LNU a.k.a. "KAINETE" under State of Arizona, Maricopa County Superior Court wiretap case CWT-460.

15. On July 13, 2015, KAINETE utilized BBM 2AD34B89 to exchange several BBM messages in the Spanish language with BBM 2B2AA036 utilized by FNU LNU a.k.a. "ROKI" [not believed by investigators to be Roque MATA]. The translated text messages are as follows:

---

2 Similar to WhatsApp, BlackBerry Messenger service is a messaging service that provides internet based multimedia messaging via software applications that function using cellular (e.g., Verizon, Sprint, AT&T) or wireless data connections (e.g., a Wi-Fi access point). WhatsApp is an alternative to traditional cellular short message service (SMS) and multimedia service (MMS), and therefore avoids SMS and MMS charges cellular providers may charge for those services. Unlike WhatsApp, a BBM Account is associated with a BlackBerry Pin rather than a telephone number.

- KAINATE: Hey, [my] brother called me last night and told me that it was hard for him to get 9 for the ride. He said to only send 10 because he can't get all [money] for the ride, what do you think?
- ROKI: Okay, let me check and I will let you know.
- KAINATE: Okay, please, that way we do not fail them
- ROKI: Okay
- KAINATE: Okay
- ROKI: Pariente *[Literally relative, however, in this context is used as a term of endearment.]*, we are going to leave things the way they are because they tell me that it's not convenient for them to take 10
- KAINATE: Okay, Pariente, we leave things the way they are then.

Based upon interceptions in this case and others in Arizona, known coded language in those interceptions, previous seizures in this case and others, training, and experience, Arizona investigators believe the above conversation discussed the "brother" of KAINATE requesting only ten (10) pounds of methamphetamine be sent because the brother was unable to get the money for the original amount. ROKI then explained that it would not be convenient for the drug trafficking organization to only send ten (10) pounds, so they were going to send the original amount ordered.

16. On July 15, 2015, KAINETE again utilized BBM 2AD34B89 to exchange several BBM messages in Spanish with BBM 2B2AA036 utilized by FNU LNU a.k.a. ROKI. The translated text messages are as follows:

- ROKI: Relative, send me your brother's number so that he can tell them where they need to go. And it's okay if he has the 5 thousand and he can take a few more days instead of sending 4 thousand, send 8 thousand.
- KAINETE: All right, I'll send it right now, relative. **316-519-8218 [TARGET TELEPHONE #1]** this is it.
- ROKI: They will tell him it's on behalf of his brother, so he can find them.
- KAINETE: All right, I'll tell this crazy guy, relative.
- ROKI: Hey, They're telling me, yes once everything is ready they are taking another 18 they will bring the money down and keep those 18 there to work with.
- KAINETE: Yes, relative we will do things how you guys want, man.

- ROKI: Like I told you, it will be a quick turnaround. What do you think relative?  So you can tell that crazy guy that there will be work there without causing too many problems.
- KAINETE: Yes, man that's fine let's give it our all.
- ROKI:  Right on.
- KAINETE: Right on.

Based upon interceptions in this case and others in Arizona, known coded language in those interceptions, previous seizures in this case and others, training, and experience, Arizona investigators believe the above conversation discussed receipt by KAINETE's "brother" of eighteen (18) pounds of methamphetamine, which ROKI has arranged to be sent to Kansas. ROKI explained that the drug trafficking organization would "front" the additional methamphetamine; that is, it would be okay that the brother did not have all the money, and that the brother could send the rest of the money later. The two also discussed KAINATE's co-conspirator or another unidentified co-conspirator who would bring the money (payment for the drugs) "down", meaning to ROKI or his source of supply in Mexico.     The intended recipient of the methamphetamine was Felizardo URIAS-Avilez, one of the subjects of the current investigation, whom DEA investigators in Wichita, KS have identified as the user of **TARGET TELEPHONE #1**.

17.    On July 17, 2015, the Honorable Pamela Gates of the Maricopa County Superior Court authorized interception of WhatsApp electronic communications over cellular telephone 52-6311011972 used by Luis Gerardo ARREDONDO-Duarte a.k.a. KOKAS, a known methamphetamine trafficker based out of Nogales, Sonora, Mexico.  ARREDONDO was identified by Arizona investigators as a source of supply for KAINATE.

18.    In subsequent intercepted conversations between ROKI and KAINETE from July 17th

and July 19th, 2015, BBM showed that the vehicle meant to transport the drugs had broken down, and that the delivery was delayed.  On July 19, 2015, ROKI told KAINETE that "they" were working on the vehicle. KAINETE texted that he hoped they would leave tomorrow (which would have been July 20, 2015) and ROKI agreed.

19.   Based on previous narcotics seizures (primarily methamphetamine) in the Phoenix, Arizona case, and on previous coded communications intercepted by investigators in this case, the investigators in Phoenix believed the user of **TARGET TELEPHONE #1, (316) 519-8218** (identified by investigators as Felizardo URIAS-Avilez), is receiving, assisting or directing others in receiving illegal drugs and providing payment for those illegal drugs in return.  The 316 prefix of **TARGET TELEPHONE #1** is designated by North American Numbering Plan to cover Kansas, specifically the Wichita metropolitan area, McConnell Air Force Base, Augusta, El Dorado, and Mulvane.  Investigators in Phoenix believed a load of illegal drugs would leave Phoenix for delivery to individuals in Kansas.  This belief was based upon the area code of the **TARGET TELEPHONE #1**.

20.   On July 31, 2015, pursuant to the court authorized interception described in Paragraph 17, the following WhatsApp communication was intercepted between ARREDONDO and an unknown individual also using a Mexican phone number.  A portion of the Spanish language communications were translated as follows:

- UNKOWN: How is it going?  Good evening, just letting you know that we had a problem with the driver; he is very upset and he is saying that we need to stop the bullshit, that we are taking advantage of him.  I'm just letting you know, Guera told me to let you know, the man is supposedly saying that he no longer wants to know anything because he was really mad at us.
- ARREDONDO: Okay

21.   Investigators believe the above conversation was in reference to the methamphetamine being sent to URIAS in Wichita, KS by KAINATE.   Based on prior intercepted communications, investigators believe URIAS was upset about receiving the original ordered amount of methamphetamine rather than the lesser amount he had later requested as discussed in Paragraph 24.   The following day, August 1, 2015, ARREDONDO was intercepted communicating over WhatsApp with URIAS, utilizing **Subject Account** associated with **TARGET TELEPHONE #1**.   The Spanish language communications were translated as follows:

- ARREDONDO: You see, the week is gone and nothing
- ARREDONDO: What's up? I need you to leave with that, old man
- ARREDONDO: Whether you/they fucking want to or not
- ARREDONDO: Is not whenever you/they want
- ARREDONDO: In fact,  I am not going to make you pay for  them, someone else will
- ARREDONDO: I want to do the fucking right thing for you guys, and you [plural] get upset because they are making you pay?
- URIAS: Hahaha, send someone to pick them up and shut your mouth
- ARREDONDO: Okay, buddy, tell that to my face next time you are around here
- URIAS: You loaned them to me so you have to fucking make me pay
- URIAS: I am fucking scared [sarcastic]

Investigators believe the above conversation is in reference to URIAS's lack of payment for the "fronted" additional methamphetamine.   ARREDONDO stated that he was trying to do URIAS a favor by sending the full amount even though ARREDONDO knew that URIAS could not pay.   URIAS told ARREDONDO in an aggressive manner to send someone to pick up the extra methamphetamine.

22.   On September 1, 2015, United States District Judge, (District of Kansas), J. Thomas Marten authorized the interception of wire and electronic communications over **316-519-**

**8218 (TARGET TELEPHONE #1)**, utilized by URIUS.   While monitoring the court authorized wire and electronic intercepts, on September 02, 2015, investigators intercepted the following phone call between URIAS, utilizing **TARGET TELEPHONE #1** and an unidentified male (UM) utilizing a Mexican phone number:

    a.  URIAS:  From here to Friday, and if this guy gets some then I told him, "I will pay…I get five (5) days, so on the fifth (5th)."
    b.  UM:  Yeah.
    c.  URIAS:  I'm going to wait from here to Friday.
    d.  UM:  Hm…or send it to/from Kevin's name.

*BREAK IN CONVERSATION*

    e.  So I will send you a message, Kevin's name so you can put it in his name.

*BREAK IN CONVERSATION*

    f.  URIAS:  Alright then, is it Kevin Plata Velazquez, right?
    g.  UM:  Kevin Plata Velazquez?
    h.  URIAS:  Velazquez with "Z?"  Both of them?
    i.  UM:  Double "Z" Velazquez, right?
    j.  URIAS:  Yes, right?
    k.  UM:  Yeah, I'll send it to you through WhatsApp right now.
    l.  URIAS:  Alright, then.

Based upon interceptions in this case and others, known coded language in those interceptions, previous seizures in this case and others, training, and experience, investigators believe that URIAS has five days from the receipt of his drugs to send the drug proceeds back to Mexico.  Investigators believe that UM is providing URIAS with a name to use to send money to Mexico.  The information about the name and any account information was sent to URIAS via WhatsApp on the **Subject Account** associated with **TARGET TELEPHONE #1**.

23.    Your affiant believes URIAS is currently utilizing WhatsApp **Subject Account** associated with **TARGET TELEPHONE #1**, will continue to use WhatsApp **Subject**

**Account** over **TARGET TELEPHONE #1** to engage in drug trafficking activities, and that the account numbers and any unique identifiers associated with each accounts/devices used to make and receive communications to and from the **Subject Account**, including identifying all participants of multi-party communications (e.g., group chat, broadcast, etc.), sent or received by the **Subject Account**, is vital to the government's ongoing investigation.   Based upon the investigation in the case the Affiant believes that violations of the Controlled Substance Act have and are occurring, including violations of Title 21, section 841, 843 (b) and 846, distribution of methamphetamine, conspiracy to distribute methamphetamine, and the use of a communication service to facilitate distribution.

FURTHER AFFIANT SAITH NOT.

Charles Armour
Special Agent, DEA

SUBSCRIBED TO AND SWORN before me this the _16th_ day of September, 2015.

**HONORABLE GWYNNE E. BIRZER**
United States Magistrate Judge
District of Kansas

Page **13** of **13**